IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CV-630-FL

| | | |
|---|---|---|
| SONYA SHAW Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF GARNER; RODNEY | ) | |
| DICKERSON Town Manager, in his | ) | ORDER |
| individual capacity; MATT ROYLANCE | ) | |
| Assistant Town Manager, in his individual | ) | |
| capacity; and B. D. SECHLER Human | ) | |
| Resources Manager, in his individual | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court upon defendants' motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (DE 21). The motion has been briefed fully, and in this posture the issues raised are ripe for ruling. For the following reasons, defendants' motion is granted.

## STATEMENT OF THE CASE

Plaintiff commenced this wrongful termination action October 30, 2023, asserting claims under 42 U.S.C. §§ 1981 and 1983, against her former employer, defendant Town of Garner ("town"), and its town manager defendant Rodney Dickerson ("Dickerson"), assistant town manager defendant Matt Roylance ("Roylance"), and human resources manager defendant B. D. Sechler ("Sechler") (collectively, "individual defendants"). Plaintiff asserts claims for retaliation in violation of the First Amendment, for race and sex discrimination, and for violation of her due

process rights. Plaintiff seeks back pay, reinstatement or front pay, liquidated and compensatory damages, as well as interest, fees and costs.

Defendants filed the instant motion to dismiss all of plaintiff's claims December 29, 2023, to which plaintiff responded in opposition and defendants replied. On March 21, 2024, the court held in abeyance entry of a case management order and deadlines for initial disclosures and commencement of discovery, until ruling on the instant motion.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. Plaintiff began her employment with the town in 2008 as parks, recreation, and cultural resources ("PRCR") director. Plaintiff was "the first African American to hold the position" and was employed by the town for over 12 years. (Compl. ¶ 10). "During a pre-hire conversation with Former Town Manager Hardin Watkins, Former Asst [sic] Manager [defendant] Dickerson and Former HR [sic] Manager Manville," plaintiff was informed "that the previous white male manager had had performance issues and had been given the option to retire, which he took." (Id. ¶ 11).

Over the course of plaintiff's employment with the town, "she received glowing reviews from her supervisors." (Id. ¶ 12). During this time, the PRCR department "was recognized and awarded locally, state-wide, and nationally." (Id. ¶ 14). "To encourage a safe working environment of all of her employees, [plaintiff] developed diversity and equity training." (Id. ¶ 15).

"In June 2019, a PRCR employee ['Washington'] filed a grievance about her performance appraisal and was told by [defendant] Sechler to send her appeal to [assistant PRCR director] Rob Smith ('Smith'). (Id. ¶ 16). Smith updated the score of the teamwork section to make the score

comparable to that of other employees involved. Plaintiff agreed with this approach, but upon further complaints by the employee, Roylance undertook a review.

Plaintiff informed defendant Dickerson "that she believed [defendant] Roylance decided to review the process because he made an assumption that [plaintiff] changed [Washington's] score, not knowing that [plaintiff] did not have access to change [Washington's] score, and that the score was actually changed" by Smith. (Id. ¶ 22). After plaintiff "shared this information with [defendant] Dickerson, [defendant] Roylance did not change the score back." (Id. ¶ 23). When plaintiff "asked about how to fix the inequity," plaintiff was told to move on, and neither defendants Dickerson or Roylance provided any follow-up. (Id.).

On October 26, 2019, Roylance issued plaintiff "a Level 1 written warning stating concerns about emails sent in 2017-18." (Id. ¶ 24). "The write-up included items that were never formally discussed nor documented" with plaintiff. (Id.). Plaintiff appealed the Level 1 warning to both defendant Dickerson and the human resources department managed by defendant Sechler. (Id. ¶ 25). Defendant Roylance denied plaintiff's appeal of her Level 1 warning; however, defendant Dickerson "rescinded the Level 1 warning due to the fact that [defendants] Roylance and Dickerson could not agree on the substance of past conversations . . . and there was no documentation related to the matters." (Id. ¶ 29). "After the abovementioned warning was rescinded, [p]laintiff began notice that [defendants] Roylance and Dickerson were treating her differently than other male and/or white employees." (Id. ¶ 30).

On January 9, 2020, plaintiff "asked about the status of incomplete, past due evaluations from [defendant] Roylance dating back to December 2017-December 2018 and December 2018-December 2019." (Id. ¶ 31). On January 28, 2020, plaintiff "followed up with [defendant] Dickerson seeking clarity on concerns raised in the rescinded document which she believed

contained negative behavioral assumptions, and about the fact that she had received the warning but that the matters in it had ever been formally discussed nor documented." (Id. ¶ 32). Plaintiff "also expressed concerns about what she believed were negative stereotypes, racial and gender bias, retaliation and preconceived notions about women of color that the warning represented to her." (Id.).

Plaintiff requested that defendant Dickerson "set up conversations about the concerns raised" by plaintiff. (Id. ¶ 33). "Instead, [defendant] Dickerson asked [plaintiff] to accept the document so 'we can move on,'" and no "meetings or discussions were held with [plaintiff] to address the concerns she raised." (Id.). In February 2020, plaintiff and defendant Roylance "met to review and discuss the 2017-18 performance evaluation," which "contained items that [plaintiff] and Roylance had disagreed about and which were contained in the in the Level 1 rescinded document." (Id. ¶ 35). Plaintiff "believed that the evaluation contained negative and incorrect assumptions, which she shared with Roylance." (Id. ¶ 36). Defendant Roylance "agreed to change a few words but not the final score on the evaluation," and plaintiff "raised concerns with Roylance about what she believed to be a retaliatory score." (Id.). On March 7, 2020, plaintiff "filed an EEOC charge alleging discrimination and retaliation." (Id. ¶ 37).

On May 27, 2020, plaintiff sent an email to defendant Roylance "recommending a special meeting for Council to review park master plans, because the Council had typically called a special meeting to review and discuss large projects." (Id. ¶ 39). Defendant Roylance "declined to take [p]laintiff's recommendation." (Id. ¶ 40).

Sometime in July 2020, plaintiff "met with managers to discuss their interest in conducting an equity session with department staff." (Id. ¶ 41). Plaintiff "knew that social equity was a major pillar of and focus in the parks and recreation profession nationally and statewide, and she shared

4

this with her entire department. (Id.). She "subsequently formed a team of diverse department staff to coordinate the project." (Id.).

On July 28, 2020, plaintiff "learned that a Council member had sent multiple emails angry about receiving park master plans late and not wanting to review them at a normal Council meeting." (Id. ¶ 42). As a result, defendants Dickerson and Roylance "then scheduled a meeting to discuss what kind of response they were going to send to the emails." (Id.). Plaintiff "felt interrogated at the meeting due to questions from both Dickerson and Roylance about whether she had had a conversation with a Council member about the plans and felt the repeated line of questioning was inappropriate, harassing and unsettling." (Id. ¶ 43). Plaintiff "denied having had a conversation with a Council member in order to precipitate angry emails." (Id. ¶ 44).

"The Council Meeting at which the plans were going to be discussed was that evening." (Id. ¶ 46). "At the Council work session, the Town Council blasted the proposed plans, did not agree with them and did not understand how 'we got there,' and expressed that they did not like the plans being presented at a Work Session." (Id.). "The Mayor then asked [plaintiff] to set up a special Council meeting as they had in the past to review the plans, just as [plaintiff] had recommended to [defendant] Roylance who refused to take the recommendation." (Id.). Plaintiff "was also forced to clean up the situation with the department consultants leading the project and with the department advisory board members who were upset at the Council's response." (Id.).

"After the debacle of a meeting, not once did [defendants] Roylance or Dickerson reach out to discuss next steps with [plaintiff], so in order to keep them in the loop, [plaintiff] initiated calls to [them] to confirm that she had their permission to set up the meetings as requested by Council and the Mayor." (Id. ¶ 48). "As a result of the meeting on July 28, the work environment

5

remained tense and [defendant] Roylance had little to no communication with Shaw about anything." (Id.).

"On August 4, 2020, the department equity session training information was finally ready to be sent to the department and was sent out." (Id. ¶ 49). "The next day, [plaintiff] learned from her assistant director Smith that some of the PRCR staff members were discussing being uncomfortable having the equity session and indicating that they did not want to talk about race at work." (Id. ¶ 50). Plaintiff "expressed to Smith that it was typical for people to feel uncomfortable talking about race and that sense of being uncomfortable was what had resulted in the development of the phrase 'being uncomfortable, with the uncomfortable' as it relates to discussions around race and equity." (Id.). Plaintiff "also expressed that the topic of feeling uncomfortable around such discussions was in fact part of the training session and participants would learn that such feelings were a normal reaction." (Id.).

During a meeting thereafter with defendant Roylance, "he shared that 'they' . . . had received complaints from staff of all races about the equity training session." (Id. ¶ 51). As plaintiff "began to explain to Roylance the same content she had shared with Smith, Roylance interrupted her and told her to cancel the training." (Id. ¶ 52). Plaintiff "was frustrated because he didn't even take the time to ask for an agenda, details or plan to hear and address concerns raised by staff and [plaintiff] shared her disappointment with his lack of trust in her and the confusion that would be created by last minute cancellation." (Id. ¶ 53). In addition, at the end of the call, plaintiff "shared her concerns with being interrogated about talking with Council members and suggested that her good working relationships she had developed over the years with Council resulted from their ability to talk to [plaintiff] about their concerns." (Id. ¶ 54). Plaintiff "had

6

noticed that ever since the meeting, she had been closely watched when having any conversations with any council members as if she was not trusted." (Id.).

"On August 6, 2020, in an attempt to respond to the concerns of staff, [plaintiff] sent an email . . . explaining why the parks and recreation profession had embraced these discussions and trainings for members, . . . and ultimately cancelling the session." (Id. ¶ 55). Plaintiff "also sent an email to [defendants] Dickerson, Roylance, and Sechler discussing her concerns about the cancellation of the session, . . . requesting a discussion with [defendant] Roylance, the planning committee, and staff to discuss concerns about the training." (Id. ¶ 56). "No one, including [defendant] Sechler, responded to the request nor did any provide any opportunity for follow up between management or staff." (Id. ¶ 57).

During a meeting thereafter, plaintiff informed Dickerson, Roylance, and Sechler that the State parks and recreation association had released new equity training session dates, plaintiff provided them details, and "they agreed to support the training." (Id. ¶ 58). An email about the new training was then sent to staff.

On August 24, 2020, Dickerson shared that "he had received complaints from staff about department leadership, so he had hired a consultant to conduct an investigation with department staff about workplace environment, policies and procedures." (Id. ¶ 60). Plaintiff "was shocked that an investigation was taking place with no prior knowledge of staff concerns or reports having been discussed with her." (Id. ¶ 61). Plaintiff "later learned that the employees who had made the complaints . . . all had previous work performance issues." (Id.). Plaintiff asked defendant Dickerson "for the details about the complaints" but he "said he could not share any information about it with her." (Id. ¶ 62). Plaintiff met with the investigating "consultant to discuss department

7

work environment, [plaintiff's] role in decision making, department operations, performance appraisal process, and managing staff concerns." (Id. ¶ 63).

Plaintiff "shared with the consultant the inequities created when [defendant] Roylance had changed the performance evaluation score," (id. ¶ 64), and they discussed plaintiff's "concerns that management was aware of [plaintiff's] concerns about bias and unfair treatment, discrimination and retaliation, lack of trust, and training needs for staff, but had taken no action to investigate or address the concerns." (Id. ¶ 65). Plaintiff also met with the consultant and defendant Dickerson to further discuss plaintiff's concerns.

"A work session was scheduled for October 20, 2020, with the Council to discuss the comprehensive parks and recreation plan." (Id. ¶ 74). "Preparation for the session involved discussing cost estimates for parks and additional services that the Council might want and need." (Id.). In advance of the meeting, plaintiff shared with defendant Roylance "and the [f]inance department some of the work completed with the consultants in order to provide better cost estimates." (Id. ¶ 75). Plaintiff "also raised the question about how much and what kind of information to share with Council." (Id.).

Plaintiff "had noted that during the September 24 Council meeting, the Council members seemed somewhat distant and that those members who normally contacted [plaintiff] about parks and recreation issues with question had not done so, and in fact they had gone 'silent.'" (Id. ¶ 77). Plaintiff "attributed this to it being likely that they had been informed that [plaintiff] was under investigation." (Id.). "On October 22, 2020, the special session took place [at which] the Council approved draft plans and moved to discuss next steps with consultants." (Id. ¶ 78). "As the [Council] discussed next steps with the consultant, [plaintiff] observed Dickerson turn around and

speak to Roylance who then stared at [plaintiff] across the room, as if to indicate that the discussion between the [C]ouncil members and the consultant should not be happening." (Id.).

"At the end of the meeting, the Council members thanked the Town staff for a great process, and for helping them think about the next steps." (Id. ¶ 79). "The meeting ended but no thanks or recognition come from [defendants] Roylance or Dickerson." (Id.). Plaintiff "was pleased to see that after the special session, calls and conversations to her from Council members resumed." (Id.). However, plaintiff "then began to be excluded from meetings that concerned the department for which [she] was the [d]irector, despite being told by [defendant] Dickerson that no personnel changes were going to be made." (Id. ¶ 80).

"On or about October 28, 2020, [defendant] Dickerson arranged a meeting with Shaw and the new attorney for the Town, Terri Jones." (Id. ¶ 81). "At that meeting, [defendant] Dickerson stated that he believed that the nationally accredited department, directed by [plaintiff] was not in a good place." (Id.). "Without any previous notice or disciplinary action, [plaintiff's] employment was terminated immediately." (Id. ¶ 82). According to the complaint, plaintiff was accused of the following:

> a. Inappropriate personal conduct, demonstrated inefficiency or incompetence in the performance of her duties;
>
> b. Inappropriate personal conduct, discourteous treatment of the public or other employee(s);
>
> c. Inappropriate personal conduct, failure to carry out supervisory responsibilities including failure to enforce Town policies concerning cash handling and use of credit cards;
>
> d. Detrimental personal conduct, the functioning of the Town may be or has been impaired;
>
> e. Detrimental personal conduct, public confidence in government is likely to be undermined; and

9

> f. Detrimental personal conduct, falsification of records to grant special privileges through manipulation of performance evaluation scores.

(Id.). According to the complaint, "the [t]own retained white, male and/or female employees that have been accused of the very behavior for which [the town] alleges it terminated [plaintiff]." (Id. ¶ 83). Plaintiff alleges that "several women have left their employment with the [the town] due to similar unfair treatment." (Id. ¶ 84).

One "analyst was repeatedly reported for rude, disrespectful and discourteous behavior, all of which were reported to [defendants] Dickerson, Roylance, and Sechler, and yet despite these reports, this female remained employed" with the town. (Id. ¶ 85). One "male director lost the trust of the Town Council when he made errors in the staffing plan and miscalculated approximately $600,000.00 in the Town's Equity Pay, Pay Adjustments." (Id. ¶ 86). "Despite these errors this male was never terminated, nor was the rest of the male's team." (Id.).

"[A]nother director was promoted to Economic Development Director but lost the confidence of the Defendant's Town Council and Manager based on his inability to perform his duty." (Id. ¶ 87). Despite this, the male was allowed to renegotiate his salary and obtain another director position. (Id.).

## COURT'S DISCUSSION

A.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not

consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).[1]

B. Analysis

1. First Amendment

Defendants argue that plaintiff's § 1983 claim based upon First Amendment retaliation must be dismissed because plaintiff does not allege protected speech.[2] The court agrees.

"In order to make out a First Amendment retaliation claim, a plaintiff must show that (1) [s]he spoke as a citizen on a matter of public concern, rather than as an employee on a matter of personal interest; (2) the employee's interest in [her] expression outweighed the employer's interest in providing effective and efficient services to the public; and (3) the employee's speech was a substantial factor in the adverse employment action." Massaro v. Fairfax Cnty., 95 F.4th 895, 905 (4th Cir. 2024).

"The first element of the test is the threshold question." Id. The court "must examine the content, form, and context of a given statement to discern whether it qualifies as expression on a matter of public concern." Id. "An employee's expression involves a matter of public concern when it involves an issue of social, political, or other interest to a community." Id. at 906. "This excludes speech that is of purely personal concern to the employee—most typically, a private personnel grievance." Id. "A qualm focused on one's own perceived mistreatment is not a matter of public concern." Id.

---

[1] Throughout this order, internal quotation marks and citations are omitted unless otherwise specified.

[2] Defendants also argue that plaintiff's First Amendment claim fails because she does not allege a causal link between her speech and her termination. Because dismissal is required on the basis of a lack of protected speech, the court does not reach this additional element of the First Amendment claim.

11

Likewise, "mere allegations of favoritism and other complaints of interpersonal discord are not treated as matters of public policy." Brooks v. Arthur, 685 F.3d 367, 372 (4th Cir. 2012). "[M]atters that are not of public concern include[e] matters of internal policy . . . and other employment-related matters." Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 353 (4th Cir. 2000). Speech on "matter[s] of interest to the community" is of public concern, while "complaints over internal office affairs" are not. Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 (4th Cir. 2017). "At bottom, the focus is upon whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee." Massaro, 95 F.4th at 906.

"The forum in which a petition is lodged will be relevant to the determination whether the petition relates to a matter of public concern." Id. "Indeed, a petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." Id. If an employee "sought to improve [her] own station by following internal procedures, rather than by communicating the alleged discriminatory practices to the public through a more transparent and accessible medium . . . such a strategy reflects the private nature of [her] speech." Id. This element also involves a "practical inquiry into the employee's daily professional activities to discern whether the speech at issue occurred in the normal course of those ordinary duties." Hunter v. Town of Mocksville, N. Carolina, 789 F.3d 389, 397 (4th Cir. 2015).

Here, plaintiff's alleged communications made before her termination do not reflect matters of public concern. As an initial matter, the forum of plaintiff's alleged communications is internal, to her supervisors, as part of her normal course of duties, all of which "reflect[] the private

12

nature of [her] speech." Massaro, 95 F.4th at 906.  While plaintiff asserts in her brief that she "spoke out about multiple matters of public concern," (Pl's Resp. (DE 24) at 12), the communications she cites involved internal communications to the individual defendants and her own department, with the exception of her own EEOC charge. (See, e.g., ¶¶ 32-33 (Dickerson); ¶¶ 34-36, 51-54 (Roylance); ¶¶ 42-48, 58 (Dickerson and Roylance); ¶¶ 56-57 (all individual defendants); ¶¶ 49, 55 (department)).  Because of the forum, these communications do not reflect a "point of view beyond the employment context." Massaro, 95 F.4th at 906.  Further, none of these communications fell outside plaintiff's alleged "daily professional activities" or "in the normal course of those ordinary duties" as director of PRCR, thus further demonstrating the lack of First Amendment coverage for her communications. Hunter, 789 F.3d at 397.

The content of plaintiff's communications also does not reflect a matter of public concern. "While it is true that discriminatory institutional policies or practices can undoubtedly be a matter of public concern," plaintiff allegedly did not communicate with her supervisors to "draw public attention to the problems [she] saw with the [town]." Massaro, 95 F.4th at 906 (emphasis added). Rather, her complaints allegedly concerned her own allegedly unfair treatment, the need for internal training for employees, as well as her suggestions for improving town policies and procedures. These "complaints over internal office affairs" are not matters of public concern. Crouse, 848 F.3d at 583.

Plaintiff argues that her communications about her "belief that Town employees needed equity training" and "her concern that she was being required to keep important information from the Town Council about her department's projects" are matters of public concern. (Pl's Resp. (DE 24) at 13).  But this argument does not address the legal standard for distinguishing matters of public concern from internal employment matters.  Plaintiff does not take into account the solely

13

internal forum for these communications, nor that they relate to "internal policy," her own duties, and her own relations with her employees, supervisors, and the Town Council, all of which amount to "matter[s] between employer and employee." Goldstein, 218 F.3d at 353; Massaro, 95 F.4th at at 906.

Plaintiff seeks to compare the instant case with Campbell v. Galloway, 483 F.3d 258, 267 (4th Cir. 2007). However, Campbell is instructively distinguishable. There, a police officer provided a memo to the chief of police complaining about an unfair write-up, unequal application of rules and polices, as well as "sexual harassment, such as complaints that officers made lewd comments in her presence and made comments belittling women." Id. at 263. The court held that "the only issues that might qualify as matters of public concern are those raising questions of sexual harassment; the remaining issues are nothing more than personal complaints and grievances about conditions of employment that cannot be considered matters of public concern." Id. at 267. The court further noted that "[c]omplaints of sexual harassment are not per se matters of public concern; whether such complaints are in any given case depends on the content, form and context of the complaint." Id. at 269. In Campbell these circumstances included "multiple instances of inappropriate [sexual] conduct directed towards her," and "complaints about inappropriate conduct directed towards other females," as well as "improper treatment of members of the public" by officers on duty on the basis of sex. Id. at 269-270. Further, the memo in Campbell spoke in "broad[] terms of sexual harassment within [the] police department." Id. at 270. Where none of these circumstances are present in the instant case, the holding in Campbell is inapposite.

In sum, plaintiff has not alleged facts giving rise to a plausible inference that she "spoke as a citizen on a matter of public concern, rather than as an employee on a matter of personal interest"

prior to her termination. Massaro, 95 F.4th at 905. Therefore, her First Amendment retaliation claim fails as a matter of law and must be dismissed.

2. Race and Sex Discrimination

Defendants argue that plaintiff's claims of race and sex discrimination must be dismissed because they are not supported by more than conclusory allegations. The court agrees.

To state a claim for discrimination in employment under § 1981 and § 1983, a plaintiff must, at a minimum, allege "facts to support a reasonable inference that the decisionmakers were motivated by" race or sex in an adverse employment action. Woods v. City of Greensboro, 855 F.3d 639, 647–48 (4th Cir. 2017) (race); Wilcox v. Lyons, 970 F.3d 452, 458 (4th Cir. 2020) (sex).[3] When a plaintiff seeks to rely upon comparison to others, she "must plead sufficient facts to demonstrate plausibly that [s]he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." Sheppard v. Visitors of Virginia State Univ., 993 F.3d 230, 238 (4th Cir. 2021). In the case of a termination, as here, a plaintiff must allege a "plausible basis for believing [others] were actually similarly situated" and "that any impropriety was comparable to the acts [the plaintiff] was alleged to have committed." Coleman v. Maryland Ct. of Appeals, 626 F.3d 187, 191 (4th Cir. 2010).

Here, plaintiff does not allege facts permitting an inference that race or sex "was the true basis for [her] termination." Id. As an initial matter, the complaint is devoid of facts suggesting that the individual defendants harbored racially or sexually discriminatory motivation in any

---

[3] Where plaintiff asserts a race discrimination claim both under § 1981 and § 1983, and a sex discrimination claim under § 1983, the court applies the standard under § 1983, which is the same as that under Title VII, in resolving these claims. See McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582, 586 (4th Cir. 2015). Because dismissal is required under this standard, the court does not reach the heightened "but-for causation standard" for a § 1981 race discrimination claim, which requires a plaintiff to plead that "but for race, [she] would not have suffered the loss of a legally protected right." Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1019 (2020).

respect. There are no allegations of comments by them concerning race or sex, or remarking about plaintiff's race or sex. Plaintiff thus must rely upon a theory of unequal treatment.

With respect to that theory of relief, plaintiff has not alleged sufficient facts to give rise to a plausible inference that similarly situated employees outside plaintiff's protected class received more favorable treatment. For example, plaintiff asserts that "[d]uring a pre-hire conversation," managers "shared that the previous white male manager had had performance issues and had been given the option to retire, which he took." (Compl. ¶ 11). This allegation is insufficient to give rise to a claim for two reasons. First, it does not permit an inference that this previous manager in was similarly situated to plaintiff: he left twelve years before plaintiff, his supervisors were different, and the complaint does not specify what he managed. Second, the complaint does not permit an inference that his "performance issues" were comparable to the reasons cited for plaintiff's termination, which were not limited merely to "performance issues." (Id. ¶¶ 11, 82). "[I]n the absence of plausible allegations that, for example, [this comparator was] similarly situated, such an allegation indicates only that she was treated differently, not that she was treated differently because of her race." Lemon v. Myers Bigel, P.A., 985 F.3d 392, 399–400 (4th Cir. 2021).

Other comparisons asserted by plaintiff in her complaint are similarly lacking in factual details permitting an inference of discrimination. Plaintiff asserts that the town "retained white, male and/or female employees that have been accused of the very behavior for which [the town] alleges it terminated [plaintiff]." (Id. ¶ 82). But the facts alleged do not support this conclusory assertion. For instance, plaintiff alleges that "an analyst was repeatedly reported for rude, disrespectful and discourteous behavior, all of which were reported to the [individual defendants] and yet despite these reports, this female remained employed with the [town]." (Id. ¶ 85). This is

16

insufficient because there is no allegation that this "analyst" was in a similar leadership position to plaintiff. Plaintiff's allegation about "several women who have left their employment with [the town] due to similar unfair treatment" suffers from the same defect. (Id. ¶ 84).

Plaintiff also seeks comparison two "male director[s]," whose race is not specified in the complaint, who were not terminated. (Id. ¶ 86). The first allegedly "lost the trust of the Town Council when he made errors in the staffing plan and miscalculated approximately $600,000.00 in the Town's Equity Pay, Pay Adjustments." (Id.). The second allegedly "lost the confidence of the Defendant's Town Council and Manager based on his inability to perform his duty." (Id. ¶ 87). However, absent more description of the alleged misconduct, these comparisons are insufficient to support a sex discrimination claim.[4] Plaintiff does not allege that she was terminated merely because she "lost the trust" or "lost the confidence" of the Town Council and manager. (Id. ¶¶ 86-87). Rather she alleges she was subject of a negative evaluation, staff complaints, an internal investigation, and a list of six enumerated accusations, including "falsification of records." (Id. ¶¶ 36, 51, 60, 67, 81-82). In sum, plaintiff fails to allege for these comparators "that any impropriety was comparable to the acts [the plaintiff] was alleged to have committed." Coleman, 626 F.3d at 191.

Plaintiff suggests that the court should not credit all the reasons defendants gave for her termination as true, where plaintiff alleges that she countered a number of the criticisms given to her. This, however, is beside the point. The court considers plaintiff's allegations of the reasons for her termination only for purposes of discerning whether there is a plausible basis for comparison, not for determining whether the accusations are true or false. See Coleman, 626 F.3d at 191; see, e.g., Nadendla v. WakeMed, 24 F.4th 299, 305–06 (4th Cir. 2022) (dismissing

---

[4] Because plaintiff does not allege their race, these comparators are not pertinent to a race discrimination claim.

discrimination claims premised upon comparison theory where plaintiff did not allege "any details about how the peer review process for physicians of Indian descent was different from the process for white physicians," even though plaintiff asserted they were "scrutinized more harshly"). Here, plaintiff has not addressed the alleged reasons for her termination in comparing herself to other employees who had been subject to discipline. As such, plaintiff has not alleged facts sufficient to give rise to a plausible inference of race or sex discrimination premised upon comparisons to other employees.

At bottom, plaintiff's race and sex discrimination claims fail as a matter of law where plaintiff has not alleged facts permitting an inference that defendants were motivated by race or sex in terminating her.

3.  Due Process

Plaintiff asserts a reputational liberty interest claim under the Due Process clause. Defendants argue that plaintiff fails to allege the requisite publication of stigmatizing statements to support such a claim. The court agrees.

To plead a due process claim based on an injury to a liberty interest in reputation, a "litigant must show [1] a statement stigmatizing [her] good name and damaging [her] standing in the community; [2] some type of dissemination or publication of the statement; and [3] some other government action that alters or extinguishes one of [her] legal rights." Elhady v. Kable, 993 F.3d 208, 225 (4th Cir. 2021).

With respect to the second element, "a purely private communication of the reasons for an employee's termination cannot form the basis for a due process claim." Sciolino v. City of Newport News, Va., 480 F.3d 642, 647 (4th Cir. 2007). In addition "a plaintiff must allege more than the mere presence of stigmatizing charges that may be available to prospective employers."

Id. at 649.  Instead, "an employee must allege . . . a likelihood that prospective employers (i.e., employers to whom [s]he will apply) or the public at large will inspect the file."  Id. at 650.  "A plaintiff can meet this standard in two ways."  Id.  "First, the employee could allege . . . that [her] former employer has a practice of releasing personnel files to all inquiring employers."  Id.  "Second, the employee could allege that although [her] former employer releases personnel files only to certain inquiring employers, that [she] intends to apply to at least one of these employers."  Id.  "In either case, [she] must allege that the prospective employer is likely to request the file from [her] former employer."  Id.

Plaintiff has not alleged facts meeting this standard in the complaint.  Rather, she alleges only that she will continue to suffer loss of reputation "in the industry in which Plaintiff has worked, thus precluding or diminishing Plaintiff's opportunity of employment in the industry in which she has worked."  (Compl. ¶ 100).  This tends to show neither a likelihood that prospective employers or the public at large will inspect the file, nor a practice of releasing personnel files to all inquiring employers or one to which plaintiff intends to apply.

Plaintiff argues that she need not allege dissemination or publication, because North Carolina General Statute § 160A-168(b)(11) makes "a matter of public record" "a copy of the written notice of the final decision of the municipality setting forth the specific acts or omissions that are the basis of the dismissal."  (Pl's Resp. (DE 24) at 14).  But the fact that the disciplinary decision is a matter of public record does not give rise to an inference that "prospective employers (i.e., employers to whom she will apply) or the public at large will inspect the file," nor "a practice of releasing personnel files" by defendants.  Sciolino, 480 F.3d at 647.  Indeed, "[s]tating that a file 'may be the subject of inspection' by or 'is available' to prospective employers . . . does not speak to the probability that they will" inspect the files.  Id. at 650 n. 5.

Accordingly, plaintiff's due process claim must be dismissed for failure to state a claim upon which relief can be granted.

## CONCLUSION

Based on the forgoing, defendants' motion to dismiss (DE 21) is GRANTED and plaintiff's claims are DISMISSED for failure to state a claim under Rule 12(b)(6). The clerk is DIRECTED to close this case.

SO ORDERED, this the 23rd day of April, 2024.

LOUISE W. FLANAGAN
United States District Judge